676 A.2d 1205

Charmaine REYNOLDS

v.

THOMAS JEFFERSON UNIVERSITY HOSPITAL
and Daniel Anthony Beneski, M.D.

Appeal of THOMAS JEFFERSON UNIVERSITY
HOSPITAL, Appellant.

Superior Court of Pennsylvania.

Argued Nov. 29, 1995.

Filed April 17, 1996.

Reargument Denied June 21, 1996.

328

M. Kelly Tillery, Philadelphia, for appellant.

Thomas J. Duffy, Philadelphia, for Reynolds, appellee.

Before HUDOCK, FORD ELLIOTT and CERCONE, JJ.

FORD ELLIOTT, Judge:

This is an appeal from the order entered May 24, 1995 and docketed June 15, 1995, denying appellant's post-trial motions and entering judgment in the amount of $600,000.[1] Because we find a material variance between appellee's pleadings and her proof at trial, which set forth a new cause of action and was thus barred by the applicable statute of limitations, we reverse.

■ As a reviewing court on a motion for a new trial or judgment n.o.v., we must consider the evidence, and all reasonable inferences which may be drawn therefrom, in the light most favorable to the verdict winner. *Stahli v. Wittman,* 412 Pa.Super. 281, 603 A.2d 583 (1992), *allocatur denied,* 533 Pa. 601, 617 A.2d 1275 (1992). With that standard in mind, we shall briefly review the facts. Appellee was admitted to appellant hospital on August 1, 1986, at which time she gave birth to her third child by Caesarean section. She was released from the hospital on August 6, 1986, but returned on August 7, 1986, complaining of pain at the site of the incision. (R.R. at 16a.) The following day, appellee suffered massive congestive heart failure. Because she was unable to breathe on her own, an emergency intubation was performed by Daniel Beneski, M.D., an anesthesiologist, who inserted an endotracheal tube through appellee's nose and down her throat. (R.R. at 16a–17a.) On August 9, 1986, the tube was

1. Another order was entered June 6, 1995, granting appellee's motion for delay damages and molding the verdict to reflect the addition of $299,239.72, for a total award of $899,279.72. While appellant raised the propriety of delay damages in its post-verdict motions, the issue is not before us on appeal.

extubated (removed). Following the extubation, appellee's throat was sore, and she could only whisper. Appellee was released from the hospital on August 14, 1986. (R.R. at 16a.)

Prior to her release, on or about August 12, 1986, appellee's case was assigned to Dr. Christopher Chambers, a specialist in family practice. (R.R. at 343a.) According to appellee, she asked Dr. Chambers about the hoarseness and sore throat almost immediately following her extubation. (R.R. at 137a.) Dr. Chambers advised appellee that her hoarseness could continue for a week to a month, and that she should wait two weeks to see what happened. (R.R. at 137a.)

Following her release from the hospital, Dr. Chambers visited appellee at her aunt's home on two occasions because she was unable to come to the hospital.[2] The first of these home visits occurred on August 21, 1986, during which the focus of the visit was appellee's infected incision and her response to the heart medication. (R.R. at 357a–358a.) Appellee testified that she again asked Dr. Chambers about her voice during this visit. (R.R. at 139a.) A second home visit occurred on August 28, 1986, with the focus once again on appellee's heart and the wound infection. (R.R. at 359a–360a.) Appellee again also asked Dr. Chambers about her voice, which, she admitted, was worse then than it was at trial. (R.R. at 140a.) Subsequent follow-up care occurred at appellant hospital throughout the months of October to December 1986. When appellee's voice still had not returned to normal by December 15, 1986, Dr. Chambers scheduled an appointment for appellee with an ear, nose, and throat specialist. (R.R. at 143a, 370a.) Eventually, appellee was diagnosed with a dislocated right arytenoid.[3] She then underwent surgery, which was considered successful; however, her voice is still "airy," and she has not been able to continue her part-time,

2. Appellee had been told she was likely to be bedridden for the rest of her life as a result of the cardiomyopathy, and that she should apply for Social Security Disability. (R.R. at 139a.)

3. The arytenoid is a small cartilage located in the larynx/voicebox. The arytenoid controls the movement of the voicebox and helps in the formation of words. (Appellant's brief at 6, *citing* R.R. at 195a, 201a, 205a, 207a.)

occasional employment as a singer, from which she earned from $50 to $100 per week in cash, supplemented by public assistance. (R.R. 150a–160a.)

On July 22, 1988, appellee filed the complaint which is the subject of the instant appeal. In it, she alleged the following:

1. Plaintiff is an individual.

2. Defendant, Thomas Jefferson University Hospital is a Corporation.

3. Defendant, Daniel Anthony Beneski, M.D. is an individual medical doctor.

4. At all times relevant to this complaint, Defendant, Thomas Jefferson University Hospital acted through its agents, servants and/or employees.

5. At all times relevant to this complaint, Defendant, Daniel Anthony Beneski, M.D. was a resident or intern at Defendant, Thomas Jefferson University Hospital and was acting as the agent, servant and/or employee of Defendant, Thomas Jefferson University Hospital.

6. On or about August 8, 1986, Plaintiff, Charmaine Reynolds was a patient in Thomas Jefferson University Hospital.

7. On or about August 8, 1986, while a patient at Thomas Jefferson University Hospital, plaintiff Charmaine Reynolds was caused to undergo a procedure where she was intubated by Defendant, Daniel Anthony Beneski, M.D. and/or other agents, servants and/or employees of Defendant, Thomas Jefferson University Hospital.

8. The intubation performed by Defendant, Daniel Anthony Beneski, M.D. and/or other agents, servants and/or employees of Defendant, Thomas Jefferson University Hospital was performed in a negligent manner consisting of:

   a) failure to use the proper size intubation tube;

   b) failure to retract the tube after there was difficulty;

   c) failure to promptly retract the tube after its improper position was noted;

d) failure to position the plaintiff properly before intubation;

e) failure to properly prepare the plaintiff for intubation;

f) failure to obtain proper assistance for nurses or other medical personal [sic] during the intubation procedure;

g) failure to properly watch and/or monitor the plaintiff;

h) failure to review records prior to intubation;

i) failure to properly train Defendant, Daniel Anthony Beneski, M.D. and or [sic] other medical personal [sic] in the proper method of intubation;

j) failure to position the intubation tube properly;

k) failure to perform treatment on plaintiff once it was apparent that the intubated [sic] procedure had been performed in a negligent manner;

l) failure to recognize that other procedures may have been utilized;

m) failure to recognize that Defendant, Daniel Anthony Beneski, M.D. and/or other personal [sic] were fatigued and should not be performing an intubation procedure on plaintiff;

n) failure to act properly under the circumstances.

9. As a direct result of the negligence of Defendant, Daniel Anthony Beneski, M.D. and/or Defendant, Thomas Jefferson University Hospital, plaintiff Charmaine Reynolds sustained serious personal injury consisting of injury to her arytenoid, voice, throat, neck, jaw, vocal folds, larynx, other body systems and emotional distress.

10. As a direct result of the injuries caused by Defendant, Daniel Anthony Beneski, M.D. and/or Defendant, Thomas Jefferson University Hospital, plaintiff, Charmaine Reynolds, has been forced to incur expenses for treatment, great pain suffering [sic], loss of employment [sic] of life, and emotional distress.

11. As a direct result of the injuries caused by Defendant, Daniel Anthony Beneski, M.D. and/or Defendant, Thomas Jefferson University Hospital, plaintiff, Charmaine

Reynolds, has been forced to incur a loss of employment at great financial loss to her.

Plaintiff/appellee's complaint, 7/22/88 at R.R. 4a–8a. By December of 1992, when appellant still had not received an expert report against Dr. Beneski, it prepared a motion to compel such a report, which it brought to a pre-trial conference. (Notes of testimony, 8/10/93 at 5.) Appellee then asked to depose Dr. Chambers as a fact witness on the subject of Dr. Beneski's negligence. (*Id.*)

On March 10, 1993, after the close of pre-trial discovery, and almost five years after the complaint was filed, appellee provided appellant with the reports of appellee's expert, Arthur Brenner, M.D., dated September 17, 1992 and March 3, 1993. The focus of these reports was the inadequacy of the follow-up care provided by Dr. Chambers, and in particular, Dr. Chambers' failure to refer appellee to a specialist when her hoarseness persisted beyond ten days. (R.R. at 21a, 24a.) In response to these reports, on March 24, 1993, appellant requested additional time to depose witnesses and to engage in additional discovery. (Appellee's brief in opposition to appellant's post trial motions, 2/28/94 at Appendix A.) Appellee did not object, and this request was apparently granted. (*Id.* at Appendix B.) On July 6, 1993, appellant filed a motion for summary judgment on behalf of Daniel Anthony Beneski, M.D., claiming that appellee had failed to produce an expert witness who would opine to a reasonable degree of medical certainty that Dr. Beneski was negligent, and further claiming that failure to produce such an expert precluded appellee from introducing evidence at trial relevant to Dr. Beneski's standard of care.[4]

On the first day of trial, August 10, 1993, appellant moved to preclude Dr. Brenner from introducing evidence at variance with the pleadings contained in the complaint, which was never amended. (Notes of testimony, 8/10/93 at 3–7.) This motion was denied. (*Id.* at 18.) At trial, appellee's expert, Dr. Brenner, testified that the injury to appellee's arytenoid

4. While this motion is a part of the original record, it is not listed on the docket and was apparently never ruled upon.

occurred at the precise moment of intubation. (R.R. at 215a.) In his report, however, Dr. Brenner stated that either intubation or extubation could have caused the dislocation. (R.R. at 233a.) Nevertheless, neither Dr. Brenner nor any of appellee's other witnesses testified that either the intubation or extubation had been performed in a substandard manner. In fact, Dr. Brenner testified that the intubation, which was done on an emergency basis, saved appellee's life. (R. 231a.) Dr. Brenner did, however, testify that Dr. Chambers deviated from the standard of care of a family practitioner by not referring appellee to a specialist when her hoarseness continued beyond ten days. (R.R. at 216a.)

When the jury retired to deliberate, it was given a verdict sheet with a set of questions. These questions addressed the negligence of Dr. Chambers as an agent of appellant hospital; none of the questions addressed the alleged negligence of Dr. Beneski.[5] (R.R. at 575a–578a.) Following deliberations, the jury returned a verdict for appellee in the amount of $600,000.

Appellant raises three issues on appeal. We need not address the third issue, as our resolution of issues one and two, which are interrelated, moots the third.[6] The first two issues are:

A. Did the trial court err when it allowed plaintiff to introduce a new cause of action where the applicable statute of limitations had expired over four years prior thereto?

B. Did the trial court err when it allowed plaintiff to present evidence at trial that was absolutely at variance with the cause of action pled in her complaint?

Appellant's brief at 3. In order to address these issues, a brief review of the law of variance is appropriate.

5. At some point, appellee apparently dismissed Dr. Beneski as a defendant in the case. (*See* notes of testimony, 1/23/95 at 11.)

6. Appellant's third issue concerns the alleged error of the trial court's charge to the jury that it should find Dr. Chambers negligent if he failed properly to diagnose, treat, or refer appellee for her hoarseness.

A variance denotes difference and in reference to legal proceedings it refers to a disagreement or difference between the allegations made and the proof shown, not in the sense that there is a failure of proof, but that, contrary to the fundamental principle of good pleading and practice, the proof fails to materially correspond to the allegations. A material variance consists of a departure in the evidence from the issues on which the cause of action must depend.

. . . .

[A]mong the typical and most damaging variance problems . . . are those cases where the proof at trial establishes a cause of action that was not alleged in the party's pleadings, . . . in which cases the expiration of a statute of limitation in the meantime . . . may be fatal to the party's claims.

. . . .

For purposes of determining whether a claimed or apparent discrepancy between pleadings and proof constitutes a variance, the entire pleadings and evidence should be considered. Generally, in order to constitute a variance, the discrepancy must exist between the allegations and proofs of the particular party, with the result that a party is not permitted to introduce evidence that is inconsistent with or fails to correspond to the allegations made by that party.

. . . .

The modern rules of pleading and practice are relatively liberal. . . . Consequently, the impact of variance may be diminished by the preference for a liberal if not informal evaluation of pleadings emphasizing the determination of cases based upon their merits rather than based on mere technicalities, which policy, for example, may allow a party to cure a variance by offering, during or after trial, to amend the pleadings to conform to the proof.

. . . .

General allegations of a pleading, which are not objected to because of their generality, may have the effect of extending the available scope of a party's proof, such that the proof would not constitute a variance, beyond that which

the party might have been permitted to give under a more specific statement.

Standard Pennsylvania Practice 2d, §§ 33:1, 33:6, 33:7, 33:8 (1994), *citing, inter alia,* 61A Am.Jur.2d, Pleading § 368; *Nelson v. Damus Bros. Co.,* 340 Pa. 49, 16 A.2d 18 (1940), (footnotes omitted); *Freeman v. Pittsburgh R. Co.,* 301 Pa. 490, 152 A. 546 (1930); *Pennsylvania R. Co. v. Pittsburgh,* 335 Pa. 449, 6 A.2d 907 (1939); *Horowitz v. Universal Underwriters Ins. Co.,* 397 Pa.Super. 473, 580 A.2d 395 (1990), *allocatur denied sub nom. Horowitz v. John's Chevrolet, Inc.,* 527 Pa. 610, 590 A.2d 297 (1991), and *allocatur denied sub nom. Petition of Universal Underwriters,* 527 Pa. 611, 590 A.2d 298 (1991); *King v. Brillhart,* 271 Pa. 301, 114 A. 515 (1921). Finally, Pennsylvania courts have held that a variance is not material if the alleged discrepancy causes no prejudice to the adverse party. Standard Pennsylvania Practice 2d § 33:10 (1994), *citing Stewart v. Uniroyal, Inc.,* 72 Pa.D. & C.2d 179 (1974), *affirmed,* 233 Pa.Super. 761, 339 A.2d 815 (1975), *affirmed,* 238 Pa.Super. 726, 356 A.2d 821 (1976).

With the relevant law before us, we may thus rephrase appellant's issue as follows: did the expert report alleging Dr. Chambers' negligence in failing to refer appellee to a specialist ten days after her extubation set forth a cause of action different from the one alleged in her complaint? If it did not, then the trial court did not err in allowing appellee to introduce the expert report at trial. *Connor v. Allegheny General Hospital,* 501 Pa. 306, 309–310, 461 A.2d 600, 602 (1983), *quoting Schaffer v. Larzelere,* 410 Pa. 402, 406–07, 189 A.2d 267, 270 (1963) ("if the proposed amendment [to the pleadings] does not change the cause of action but merely amplifies that which has already been averred, [the amendment] should be allowed even though the Statute of Limitations has already run."); *Laursen v. General Hospital of Monroe County,* 494 Pa. 238, 241–44, 431 A.2d 237, 239–40 (1981) (amendments of pleadings to conform to the evidence presented at trial should be liberally allowed to secure a determination of cases on their merits, provided that the granting of the amendment would not introduce a new cause of action after the statute of

limitations had run). If, however, the expert report sets forth a new cause of action, then the trial court erred in allowing appellee to introduce the report after the applicable statute of limitations had run.[7]

■ The Pennsylvania Supreme Court has never adopted a comprehensive definition of "cause of action"; however, relevant to negligence actions, this court has previously stated:

A cause of action in negligence has been defined as the negligent act or acts which occasioned the injury for which relief is sought. *Cox v. Wilkes–Barre Railway Corporation,* 334 Pa. 568, 570, 6 A.2d 538, 539 (1939); *Martin v. Pittsburgh [sic] Railways Company,* 227 Pa. 18, 20, 75 A. 837, 837 (1910). A new cause of action does not exist if plaintiff's amendment merely adds to or amplifies the original complaint or if the original complaint states a cause of action showing that the plaintiff has a legal right to recover what is claimed in the subsequent complaint. *Wilson v. Howard Johnson Restaurant,* 421 Pa. 455, 460, 219 A.2d 676, 678–79 (1966); *Arner v. Sokol,* 373 Pa. 587, 591, 96 A.2d 854, 855–56 (1953); 3 *Standard Pennsylvania Practice* .682. A new cause of action does arise, however, if the amendment proposes a different theory or a different kind of negligence than the one previously raised *or if the operative facts supporting the claim are changed.* 2B Anderson *Pennsylvania Civil Practice,* §§ 1033.28 and 1033.31.

*Junk v. East End Fire Dept.,* 262 Pa.Super. 473, 490–91, 396 A.2d 1269, 1277 (1978) (emphasis added).

■ Support for this definition is found in *Saracina v. Cotoia,* 417 Pa. 80, 208 A.2d 764 (1965), in which our supreme court stated, "[a]n amendment of the complaint under Rule 1033 which adds or changes the theory of recovery upon which relief is sought through the introduction of new factual allegations generally constitutes a new cause of action...." *Id.* at 85, 208 A.2d at 767, *citing Willinger v. Mercy Catholic Medical Center,* 482 Pa. 441, 444 n. 2, 393 A.2d 1188, 1189 n. 2

7. The applicable statute of limitations as set forth at 42 Pa.C.S.A. § 5524 is two years.

(1978) (refusing to allow hospital to amend its negligence complaint against anesthesiologist to include vicarious liability for the negligence of a nurse/anesthetist). Stated differently, an amendment proposes a different theory or a different kind of negligence if the operative facts supporting the claim are changed. *See also Jaindl v. Mohr*, 432 Pa.Super. 220, 229–30, 637 A.2d 1353, 1358 (1994) (refusing to allow amendment where initial complaint in defamation was based solely upon the conduct of the defendant, while amended pleadings would include the conduct of others acting as defendant's agent), *affirmed*, 541 Pa. 163, 661 A.2d 1362 (1995); *Wilson v. Howard Johnson Restaurant*, 421 Pa. 455, 459–61, 219 A.2d 676, 678–79 (1966) (where plaintiff's original complaint was based upon defendant's negligence in permitting ice to form on its sidewalk, an amendment to charge defendant with maintaining a potentially dangerous picket fence next to the walkway introduces a new cause of action).

In the instant case, at no time did appellee move to amend her original complaint. In addition, appellee's allegations in her complaint are clearly directed at the negligent acts of Dr. Beneski, the anesthesiologist, and those assisting him in performing the intubation and extubation. (*See* appellee's complaint, *supra*, nos. 3, 5, 7, 8a-m, 9, 10, 11.) Appellee, however, cites her complaint at 8g, 8k, and 8n to support her claim that Dr. Chambers' alleged negligent referral is a mere amplification of her complaint. (Appellee's brief at 10.) We shall analyze these allegations together.

All of the subsections of the complaint cited by appellee are part of the broader section, which begins: "The intubation performed by Defendant, Daniel Anthony Beneski, M.D. and/or other agents, servants and/or employees of Defendant, Thomas Jefferson University Hospital was performed in a negligent manner consisting of: . . . ." This opening language must therefore be read as part of the allegations contained in subsections "a" through "n." These subsections are thus clearly applicable only to the alleged negligent intubation "performed by Defendant, Daniel Anthony Beneski, M.D." While it is true that the prefatory clause refers to agents,

servants, and/or employees of appellant hospital, nevertheless, it is equally true that they are referenced *solely within the context of the intubation performed by Dr. Beneski.* To read "the intubation performed by Dr. Beneski [and/or other agents] . . . in a negligent manner [on or about August 8]" to include Dr. Chambers' allegedly negligent failure to refer appellee to a specialist between August 19 [8] and September 9 is to stretch the meaning of the words far beyond that which we ordinarily give them.

In addition to the flaw in appellee's argument just noted, another flaw exists in appellee's attempt to apply subsection 8k to Dr. Chambers. In this subsection, appellee claims that Dr. Beneski and/or other agents of the hospital were negligent in their "failure to perform treatment on plaintiff once it was apparent that the intubated procedure had been performed in a negligent manner[ ]." (Appellee's complaint, 7/22/88, R.R. at 8a.) No evidence was ever introduced, however, that the intubation was performed in a negligent manner. As a result, even if this subsection could somehow be read to apply to Dr. Chambers, appellant's failure to perform treatment on this basis could not have been negligent.

Appellee argues that her pleadings instantly are analogous to the pleadings in *Connor, supra,* and that *Connor* therefore controls the outcome of the case instantly. In particular, appellee claims that the catch-all phrase in her pleadings at 8n., "failure to act properly under the circumstances[,]" sweeps so broadly that it includes Dr. Chambers' follow-up care, in the same way that the catch-all phrase in *Connor,* "In otherwise failing to use due care and caution under the circumstances[,]" was held by the *Connor* court to include alleged negligent follow-up care. While on their surface, the two allegations appear to be almost identical, a closer inspection reveals a critical distinction. The facts of *Connor* follow.

**8.** Because Dr. Brenner opined that Dr. Chambers should have referred appellee to a specialist when her hoarseness had not subsided within ten (10) days, we infer that August 19, ten days after the extubation, would be the earliest point at which Dr. Chambers could have been negligent.

In *Connor*, appellant Mary Connor was admitted as an emergency patient to Allegheny General Hospital complaining of abdominal distress. While a patient, she underwent a barium enema. During the procedure and for several hours thereafter, the barium solution leaked out of a perforation in her colon and into her abdominal cavity. As a result of the leakage, several surgeries were required, to remove the barium, to drain an abscess, to remove the damaged portion of the colon and one ovary, and to repair or remove adhesions which had formed on the colon. *Connor, supra* at 308–09, 461 A.2d at 601.

Connor and her husband subsequently filed a complaint against Allegheny General, in which they alleged that the hospital, acting individually and through its employees, was negligent:

a. In perforating the sigmoid colon during the performance of a barium enema procedure;

b. In perforating the sigmoid colon and causing extravasation of the barium into the abdominal cavity causing barium peritonitis;

. . . .

f. In otherwise failing to use due care and caution under the circumstances.

*Id.* The allegations in the complaint were based upon the "expert" report of Dr. Cyril Wecht, M.D., in which he opined that such a leakage "does not ordinarily occur if a barium enema is performed properly and carefully." *Id.* Four years after the injury, and twenty-five months after the complaint was filed, the case was called for trial; however, Dr. Wecht refused to testify, apparently because he was not an expert in the field and would be dismissed from the Pennsylvania Medical Society for testifying. *Id.* at 309 n. 1, 461 A.2d at 601 n. 1. As a result, the trial was postponed. The Connors then sought to file an amended complaint based upon the report of a second expert, Dr. Bernard Neff, M.D.; however, Dr. Neff was not able to say with a reasonable degree of medical certainty that the barium enema caused the perforation. Nev-

ertheless, he did opine that the perforation should have been diagnosed more quickly, and that there was "undue delay in performing surgery on a patient with perforation and acute peritonitis." *Id.* The focus of the amended complaint was, therefore, on the delay in cleansing the abdominal cavity after the perforation became or should have become apparent. *Id.* at 309–11, 461 A.2d at 602.

The trial court denied the Connors' motion to amend the complaint, after which the court granted Allegheny General's motion for summary judgment. This court affirmed, finding that the amendments "clearly involved new and different negligent acts neither contemplated by nor inferable from the original complaint. . . ." *Connor v. Allegheny General Hospital,* 300 Pa.Super. 321, 327, 446 A.2d 635, 638 (1982). On grant of allocatur, the supreme court reversed, holding instead that the "proposed amendment, does, in fact, amplify one of the allegations of the original complaint. . . ." *Connor, supra* at 310, 461 A.2d at 602 (referring to allegation "f," "otherwise failing to use due care and caution under the circumstances"). As the *Connor* court stated, "In their original complaint, [the Connors] did not merely allege that the barium enema had been negligently performed. Rather, [the Connors] also alleged that [the hospital], acting individually and through its employees, was negligent '[i]n otherwise failing to use due care and caution under the circumstances.' " *Id.*

We find the instant case distinguishable for two reasons. First, in *Connor,* the negligence alleged in the original complaint and the negligence alleged in the amended complaint "were part of a causally related chain of events which occurred on the same day . . . and at the same place. . . ." *Connor v. Allegheny General Hospital,* 300 Pa.Super. 321, 330, 446 A.2d 635, 640 (1982) (Cirillo, J. dissenting). Ms. Connor was given a barium enema, the contents of which leaked into her abdominal cavity and remained there for several hours. The same cannot be said in the instant case, where Dr. Chambers had not even been assigned to appellee's case at the time of the intubation.

A more important distinction, and one that is fatal to appellee's argument, exists between *Connor* and the instant case, however. As the *Connor* court aptly noted, the Connors *"did not merely allege that the barium enema had been negligently performed." Id.* The structure of the Connors' complaint makes this clear. The Connors alleged in "a" and "b" that the hospital or its agents were negligent "in perforating" the colon and "in causing extravasation;" however, in a separate and equally weighted allegation, they alleged that the hospital was negligent "in otherwise failing to use due care and caution under the circumstances." As the *Connor* court noted, the hospital could have filed a preliminary objection in the nature of a request for a more specific pleading or a motion to strike if it did not know to what "f" referred. *Id.* at 311 n. 3, 461 A.2d at 602 n. 3.

In the instant case, however, as we have already noted, appellee *did* only allege that the intubation had been negligently performed; the "catch-all" language, "failure to act properly under the circumstances," is a clause in a sentence alleging that the intubation was performed in a negligent manner. Even if appellant had requested a more specific pleading, the only amplification that could properly have occurred under section 8 would have been in reference to the allegedly negligently performed intubation.

It is clear that Dr. Chambers' alleged negligence is supported by an entirely separate set of operative facts from those that would have supported Dr. Beneski's alleged negligence. *See Junk, supra* at 490–91, 396 A.2d at 1277 (a new cause of action arises if the amendment proposes a different theory or a different kind of negligence than the one previously raised or if the operative facts supporting the claim are changed), *citing* 2B Anderson *Pennsylvania Civil Practice,* §§ 1033.28 and 1033.31. Appellee's expert opined that Dr. Chambers was negligent for failing to refer appellee to a specialist by September 9 (one month after the *extubation*). The operative facts supporting Dr. Chambers' alleged negligence relate to his failure to recognize the potential seriousness of appellee's hoarseness and his delay in referring her to

a specialist. In order to defend against this allegation, appellant would have been required to retain an expert in the field of family practice. Appellee's complaint, however, alleged the negligence of Dr. Beneski and other hospital agents in their performance of the intubation. To defend against these allegations, appellant would have been required to, and did, retain an expert in the field of anesthesiology. If we were to allow Dr. Chambers' alleged negligence to be read into an allegation that "the intubation was performed in a negligent manner," simply because appellee tacked on the phrase "failure to act properly under the circumstances," we would, in effect, be abolishing the requirement that a cause of action must be filed within the applicable statute of limitations.

As a result of the foregoing, we find a material variance existed between the claim set forth in appellee's complaint and the claim proven at trial. Because the claim against Dr. Chambers set forth a separate and distinct cause of action, based upon a separate set of operative facts, it was barred by the statute of limitations.[9] *Schaffer, supra* at 407, 189 A.2d at 270 ("An amendment introducing a new cause of action will not be permitted after the Statute of Limitations has run in favor of a defendant: ... This would constitute 'resulting prejudice' to the adverse party.").

We therefore vacate the orders entering judgment in favor of appellee and enter judgment in favor of appellant. Jurisdiction is relinquished.

---

9. In fact, this cause of action was barred by the statute of limitations in March of 1993, when appellee first provided appellant with Dr. Brenner's expert report containing allegations of Dr. Chambers' negligence.