## Estate of Cooper v. Pinebrook Services for Children and Youth Inc.

C.P. of Lehigh County, no. 93-C-2177.

*Charles Mandracchia* and *Bruce L. Baldwin*, for plaintiffs.

*Frank L. Baker III*, for defendants Laidlaw Transit Inc. and Reppert.

BLACK, *J.,* June 28, 2000—In this wrongful death and survival action[1] plaintiffs have moved for a new trial following a jury verdict in favor of the defendants. The case arises from an incident on October 8, 1991, when plaintiffs' decedent, April Renee Cooper, a 9-year-old child, was fatally injured. April was struck by a pickup truck as she was attempting to cross 15th Street in the

---

1. During the course of the trial the wrongful death claim was withdrawn. The only claim submitted to the jury was the claim under the Survival Act, 42 Pa.C.S. §8302.

City of Allentown. Shortly beforehand, April had alighted from a school bus owned by defendant Laidlaw Transit Company and operated by defendant Shirley Reppert, a Laidlaw employee.

Plaintiffs Catherine M. Cotturo and George Rick Cooper brought the action as April's parents and as administrators of her estate. However, legal custody of April at the time of her death was in the Montgomery County Office of Children and Youth Services. This agency had placed April in the physical custody of defendant Pinebrook Services for Children and Youth Inc., a nonprofit organization under contract with the agency to provide foster care services. Pinebrook had placed April in the foster home of defendant Judith Rehrig since November of 1990.

At trial, plaintiffs contended that Reppert and Laidlaw were negligent in dropping April off at an unauthorized and unsafe location. Plaintiffs settled their claims against Pinebrook and Rehrig prior to trial, but these defendants remained as parties in the case for the purpose of apportioning liability.

In response to special interrogatories, the jury found (1) that Reppert was not negligent; (2) that Laidlaw was negligent other than as employer of Reppert, but that Laidlaw's negligence was not a substantial factor in bringing about April's death; (3) that April was contributorily negligent, but that her contributory negligence was not a substantial factor in bringing about her death; and (4) that Rehrig was negligent and her negligence was a substantial factor in bringing about April's death, but that plaintiffs were entitled to zero damages. A molded verdict in favor of all defendants was then entered.

We believe that plaintiffs received a very fair trial and that their allegations of trial error are meritless. Therefore, plaintiffs' post-trial motion is denied.

## FACTS

In reviewing a motion for post-trial relief, we are required to examine the evidence in a light most favorable to the verdict winners, in this case the defendants, and to give them the benefit of all reasonable inferences that may be drawn from that evidence. *Reynolds v. Thomas Jefferson University Hospital,* 450 Pa. Super. 327, 330, 676 A.2d 1205, 1206 (1996). Hence, for purposes of plaintiffs' motion the relevant facts are as follows:

April was a hyperactive, impulsive 9-year-old child with a learning disability. She was in the legal custody of OCYS, which had placed her in the physical custody of Pinebrook. Pinebrook assigned Rehrig as April's foster parent, and from November of 1990 until her death April resided with Rehrig at her home in the City of Allentown. Rehrig is a widow with three children and five grandchildren. She has been a foster parent for 14 years, caring for approximately 55 children over that period of time.

In the fall of 1991, April was enrolled in classes for the learning disabled at the Union Terrace Elementary School in the Allentown School District. She was transported to and from that school on a bus owned and operated by Laidlaw, under contract with the Allentown School District. The bus was driven on the date of the incident by a Laidlaw employee, Reppert. The contract for school bus service gave the school district the right

to select the bus routes and drop-off points. At the beginning of the 1991-1992 school year, the transportation plan established by the school district provided that April would be dropped off every afternoon after school on the *east* side of 15th Street, directly in front of the Jackson Elementary School. The Rehrig residence was a block and a half from this school, but was on the *west* side of 15th Street. Thus, for April to get from the drop-off point to her foster home, she had to cross 15th Street.

On several occasions at the beginning of the school year, Reppert observed April darting in front of the school bus and into traffic on 15th Street, presumably to return to her foster home located on the west side of 15th Street. As a result, Reppert changed the bus drop-off point from the east to the west side of 15th Street. Before doing so, Reppert consulted with her supervisor at Laidlaw, Helen Marrah, who obtained verbal authorization for the change from the school district. However, the records of the school district did not contain any mention of this authorization, and school district personnel had no recollection of a request for change.

April often attended activities at the Allentown Girls Club after school. On some days the Girls Club van was available to pick her up in front of the Jackson Elementary School on the east side of 15th Street, opposite the side on which her foster home was located and also opposite the side of the new drop-off point. On other days April would walk from the drop-off point to the Girls Club, which required her to cross a number of streets.

On the afternoon of Tuesday, October 8, 1991, after school, April was picked up at the Union Terrace School and transported by Reppert on the Laidlaw school bus.

April was dropped off with some other children at the new drop-off point on the west side of 15th Street. One of the children crossed to the east side of 15th Street under the protection of the flashing red lights on the bus. April did not immediately cross to the east side. However, shortly afterwards, she attempted to do so, presumably to board the Girls Club van in front of the Jackson Elementary School. In attempting to cross the street, April ran into the path of an oncoming pickup truck driven by Thomas Ritter. As a result, she suffered fatal injuries and was pronounced dead on the afternoon of October 8, 1991.

Plaintiffs initially instituted an action in the United States District Court for the Eastern District of Pennsylvania against the current defendants as well as the Allentown School District, its superintendent, and other parties. Federal jurisdiction was alleged on the theory that the actions of the school district and its superintendent had violated the United States Constitution. The district court dismissed the federal claims and refused to exercise pendent jurisdiction over the remaining state claims. Plaintiffs then commenced this action in the Lehigh County Court of Common Pleas against the current defendants and OCYS.

Plaintiffs discontinued their claim against OCYS prior to trial for reasons that do not appear of record.

## DISCUSSION

The grant or denial of a motion for a new trial is a matter within the discretionary powers of the trial court. See *Kiser v. Schulte,* 538 Pa. 219, 225, 648 A.2d 1, 4

(1994); *Spang & Co. v. United States Steel Corp.,* 519 Pa. 14, 545 A.2d 861 (1988). Such a motion should be granted where the trial court "has committed an error of law that controlled the outcome of the case." *Buckley v. Exodus Transit & Storage Corp.,* 744 A.2d 298, 305 (Pa. Super. 1999). The trial court may also grant such a motion "when the jury's verdict is so contrary to the evidence that it 'shocks one's sense of justice.' " *Neison v. Hines,* 539 Pa. 516, 520, 653 A.2d 634, 636 (1995) (quoting *Kiser v. Schulte,* 538 Pa. 219, 226, 648 A.2d 1, 4 (1994)); see also, *Livelsberger v. Kreider,* 743 A.2d 494 (Pa. Super. 1999).

Plaintiffs do not assert as a ground for new trial that the verdict was contrary to the weight of the evidence. However, they do claim that the court committed various errors of law during the course of the trial. Two of plaintiffs' contentions relate to evidentiary rulings; two relate to the closing argument; and a final contention relates to the jury instructions. We will review these issues in the order in which they arose during the trial.

## I. *Evidentiary Rulings*

### A. Evidence That Plaintiffs Asserted Claims Against Other Persons in the Federal Action

Defense counsel was permitted to inquire of Catherine M. Cotturo, one of the plaintiffs, on cross-examination whether her attorneys had filed suit on her behalf in the United States District Court for the Eastern District of Pennsylvania against certain other parties not involved in the current lawsuit, including OCYS; Walter Junowicz,

its executive director; Florence Applebaum, Pinebrook's executive director; the Allentown School District; and Diane Scott, its superintendent.[2] Ms. Cotturo recalled that suit had been filed against OCYS and against the Allentown School District. At first she did not recall the other referenced defendants, but later said she thought they probably had been included in the federal suit.[3]

These questions followed a lengthy sidebar conference, at which counsel discussed with the court the best way to handle this issue.[4] We ruled then, correctly we believe, that defense counsel could ask Ms. Cotturo whether she had filed suit against other parties as a result of this accident, but that defense counsel could not go into the details of the other suit. We further ruled that plaintiffs could then establish that the federal action had been dismissed and that these other parties were not parties to the Lehigh County action.[5]

Plaintiffs' counsel questioned Ms. Cotturo briefly about the federal lawsuit on redirect examination, eliciting from her the explanation that at the time that lawsuit was filed she had only limited information about the possible involvement of the other parties.[6] The tack taken by plaintiffs' counsel on redirect examination was to suggest that the federal action had been filed based on

---

2. N.T. at 25-26.

3. N.T. at 25-30.

4. N.T. at 18-25.

5. N.T. at 18-23.

6. Plaintiffs' counsel did not request the court monitor to transcribe the redirect examination of Ms. Cotturo. Therefore, we base this statement on our recollection, which is confirmed by the questioning of defense counsel on recross-examination. See N.T. at 27.

inadequate information, thus implying that the case was dropped once additional information was learned.

On recross-examination defense counsel then asked:

"Miss Cotturo, your attorney got you to say that when you filed these lawsuits you only had a little bit of information about these agencies. Do you recall that testimony a minute ago?" [7]

Defense counsel then had Ms. Cotturo confirm through a few additional questions that she had in fact included the school district and other parties in the federal action. Nothing was said to imply that the school district or any of the other parties had settled the claims against them. The innuendo that remained from the redirect examination was that the federal suit had been filed prematurely before plaintiffs' counsel had fully investigated the case.

At the trial of this case, one of the central issues was whether the Allentown School District had approved the change in the bus drop-off point from the east to the west side of 15th Street. The school district had the right by contract to designate the bus stops, and Laidlaw's representative testified that the school district had verbally authorized the change. However, the school district records and personnel could not confirm this. Therefore, plaintiffs argued that the change was made without authorization and hence was improper. They further argued that the result of the change was to increase the risk of harm to April, since she now had to cross 15th Street if she wanted to meet the Girls Club van or walk to the Girls Club. Therefore, it was certainly relevant for the jury to know that plaintiffs, who were now blaming

---

7. N.T. at 27.

Laidlaw and Reppert for the change in the location of the bus stop, had previously asserted that the Allentown School District and its superintendent, Diane Scott, were at fault in causing April's death.

Also, since Rehrig and Pinebrook were still in the current case as defendants for alleged inadequate supervision of April, it was relevant to show that plaintiffs had previously sued OCYS, which had legal custody of April, and its executive director. Evidence of the prior federal claims against these other persons tended to show a lack of sincerity on the part of plaintiffs in now seeking to place all the blame for April's death on Laidlaw and its driver.

As a general rule, all relevant evidence is admissible except as otherwise provided by law. Pa.R.E. 402. However, relevant evidence may be excluded "if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Pa.R.E. 403.

Plaintiffs contend that reference to the federal action created the inference that there was a settlement of claims against the other parties. This argument is patently false. There was no mention of a settlement, directly or indirectly. The only inference to be drawn from the evidence was, as plaintiffs' counsel suggested on redirect examination, that the federal action had been filed prematurely before plaintiffs' investigation had been completed and that the federal action was not pursued once all the facts were learned.

The court specifically authorized plaintiffs' counsel to elicit the fact that the federal suit had been dismissed,

if counsel wished to do so.[8] Plaintiffs' counsel was not precluded from inquiring about the federal case on redirect examination so long as the information was accurate. During the sidebar conference, plaintiffs' counsel was asked by the court, "What do you want to ask in response?"[9] His suggestion was that he be allowed to establish that the other defendants were no longer parties in this case, to which the court readily agreed. When plaintiffs' counsel suggested further the possibility of discussing the jurisdictional issues in the federal case, the court expressed its view that this would cause too much confusion but added, "But if you have any ideas I'll be glad to consider it."[10] Plaintiffs' counsel did not offer any further suggestions.

We do not believe the brief questions regarding the federal claims created any unfair prejudice, confused the issues, or misled the jury. The whole episode consisted of a few questions in a three-day trial. The point was not addressed at all during closing arguments. No request was made by plaintiffs for a special instruction.

Plaintiffs cite Pennsylvania Rule of Evidence 408, which precludes evidence that a valuable consideration was furnished or accepted in compromising or attempting to compromise a claim, for the purpose of proving liability for, or invalidity of, the claim. However, as we have noted, no evidence of a compromise settlement or an offer to settle was presented at trial. Therefore, this rule was not violated.

---

8. N.T. at 22.
9. N.T. at 21.
10. N.T. at 23.

## B. Evidence of the Route April Cooper Followed in Walking From the Bus Stop to the Girls Club

Plaintiff called Rehrig, April's foster mother, as a trial witness. April had resided with her from November 1990, until the fatal accident of October 8, 1991. On direct examination, plaintiffs' counsel established from Rehrig that April was involved in the Girls Club after school and that most of the time she was transported there by the Girls Club van, which picked her up on the east side of 15th Street in front of the Jackson school.[11]

On cross-examination, Laidlaw's counsel questioned Rehrig regarding the route that April followed in walking to the Girls Club from the Jackson school on those days when she did not take the Girls Club van. The following exchange ensued:

"Q. (by Mr. Baker) On line 12 (referring to Mrs. Rehrig's deposition) your question was, 'Could you show me where your house is or where she walked?' And what was your answer?

"Mr. Mandracchia: Your honor, I'm going to object. Only if she was there. . . . I'm not sure if she was there when she walked."[12]

The court then required Laidlaw's counsel to establish a foundation. Some other questions followed, and Laidlaw's counsel never returned to the objected-to question. It was never answered. Shortly afterwards, Laidlaw's counsel asked:

---

11. N.T. at 70-72.
12. N.T. at 83.

"Q. And then farther down the page the question was asked—you asked, 'From Jackson?' And then the question was, 'Is that where she started?' meaning from Jackson. And would you read your answer, please.

"A. 'Yes, they would go up there and down one more street, up Turner and then down.'

"Mr. Mandracchia: Your honor, still the same objection.

"The court: Okay. Are you familiar with the route that April would have followed in walking to the Girls Club?

"A. Yes.

"The court: How are you familiar with that? Did you see her walking there on occasion?

"A. I must have. I must have at one time.

"The court: Okay. We'll allow the question.

"Q. (by Mr. Baker) Didn't you walk her to the Girls Club a couple of times to show her the route?

"A. Yes.

"Q. All right. And is it correct that you walked along 15th Street with her?

"A. Yes.

"Q. And that you would cross Liberty Street?

"A. Yes.

"Q. And also that you had showed her how to cross Gordon Street?

"A. Yes.

"Q. And is Chew Street also in there before you get to Turner?

"A. Yes." [13]

---

13. N.T. at 84-86.

Laidlaw's counsel continued to develop through Rehrig that April would have had to cross a number of streets in order to reach the Girls Club from the Jackson Elementary School. No further objections were made to this testimony.

Thus, Plaintiffs' counsel objected to Rehrig's testimony on only one ground, that no foundation had been established. Plaintiffs' counsel did not object to her testimony on the ground of lack of relevance.

In its motion for new trial, plaintiffs now claim that this testimony was irrelevant. They also repeat their objection that there was a lack of foundation. As to the alleged lack of foundation, we believe that this objection was properly handled. The witness was prevented from answering the two questions that were objected to until a proper foundation had been developed. The witness never answered the first of these questions. She answered the second only after testifying that she was familiar with the route that April would have followed; that she saw April walking that route on occasion; and that she herself walked April to the Girls Club several times to show her the route." [14]

As to the alleged lack of relevance, plaintiffs have waived any such objection since their only objection to this testimony at trial was for lack of foundation. See *Takes v. Metropolitan Edison Co.*, 548 Pa. 92, 98, 695 A.2d 397, 400 (1997) ("It is axiomatic that in order to preserve a trial objection for review, trial counsel is required to make a timely, specific objection during trial."); *Aiello v. SEPTA*, 687 A.2d 399, 403 (Pa. Commw. 1996)

---

14. N.T. at 85.

("A party complaining on appeal of the admission of evidence objected to in the court below will be limited to the specific objection made at trial."); *Holy Family College v. W.C.A.B. (Halyna Kycej)*, 84 Pa. Commw. 109, 115, 479 A.2d 24, 28 (1984) ("Moreover, the rule is well settled that where the grounds upon which an objection to evidence is based are specifically stated, all other reasons for exclusion are waived and may not be raised on appeal."). Accordingly, plaintiffs cannot now assert, as a ground for a new trial, that the testimony was not relevant.

Moreover, the questions regarding April's route to the Girls Club *were* relevant for several reasons. First of all, plaintiffs themselves opened up this line of inquiry on direct examination by establishing that April went to the Girls Club after school by van most of the time and also went there on days when the van was not available.[15] It was appropriate on cross-examination for the defense to establish the route that April followed on those days when she did not take the Girls Club van. In addition, there were issues in the case as to the negligence of Rehrig and the comparative negligence of April. April's training and experience in crossing streets was relevant to the jury determinations as to whether Rehrig failed to exercise due care by not meeting April at the bus stop and as to the standard of care to which April should be held.

Finally, it is inconceivable that testimony regarding the route that April would have followed could have been prejudicial to plaintiffs. Whatever April's precise route

---

15. N.T. at 69-73.

was, it was obvious that she would have to cross a number of streets to reach the Girls Club on foot from the Jackson Elementary School.

## II. *Closing Argument*

### A. Unrecorded Comments From Defense Table During Plaintiffs' Closing Argument to the Jury

According to plaintiffs' counsel, defendant Reppert and Laidlaw representative Helen Marrah, who were seated at the defense table in front of the jury box, made comments that the jury could hear during Mr. Mandracchia's closing argument. However, as the record shows, although Mr. Mandracchia registered a complaint during his closing argument that comments were being made from the defense table, he never placed on record what those comments were.[16] As the trial judge, I did not hear any such comments, and I have no idea what they allegedly consisted of. Therefore, there is no way in which this issue can justify a new trial.

The record discloses that in the course of his closing argument Mr. Mandracchia stated, "Your honor, I've asked for no comments from the defense table." The court responded, "I'm sorry, I didn't hear. But if there are, that's quite out of order." [17] Mr. Mandracchia then continued his closing argument. Neither at the time of his statement nor at any later time in the trial did he make a record of what he claims was said. Nor did he request any spe-

---

16. N.T. at 115.
17. *Id.*

cial instructions from the court on this point, nor did he move for a mistrial.

At this late date, plaintiffs' counsel now complains that the court should have specially instructed the jury to disregard these allegedly improper comments. First of all, the court did not hear any comments and plaintiffs' counsel never placed on the record the substance of these comments. Second, the court specifically stated that any such comments were "quite out of order." Any juror would have understood this to mean that such comments were not to be considered. Third, since plaintiffs' counsel never requested a special instruction during the trial, his complaint at this time is untimely. As the Superior Court stated in *Vernon v. Stash,* 367 Pa. Super. 36, 49, 532 A.2d 441, 447 (1987):

"An assignment of error that the trial court failed to give a specific instruction will not be considered unless it affirmatively appears from the record that a request for such an instruction was made, that it was denied by the trial court, and that an appropriate objection was taken to the action of the court."

## B. The Closing Argument of Laidlaw's Counsel

Plaintiffs' counsel objected to the following closing argument of Laidlaw's counsel:

"This case is about greed. How many times did Mr. Mandracchia say to you during his closing about what a big company Laidlaw is and how this is a commercial business. Of course it is. Is there anything wrong about hiring employees, paying citizens in the City of Allentown to have employment? No, there isn't. This case is

about sympathy and greed. As I mentioned to you earlier in this case, the sympathy that we feel for April, her parents, has nothing to do with who was at fault for this accident, if anybody was at fault.

"It may be easy for you to go into the jury room and say, well, Laidlaw's a big company, let's give them something. That's not the way our system works and it's not the way it ought to work, and it will be a grim day for people in our city and in our country if some kid runs out in front of your car sometime or some child—somebody falls on somebody's sidewalk and some jury looks at this case that way and says, well, let's give them something. And there was no negligence and no responsibility—." [18]

Mr. Mandracchia interrupted the argument at this point to interpose the following objection: "Your honor, I object to the way another jury will look on this case." [19] At first Mr. Mandracchia's objection was not audible, but after he repeated it several times, the court sustained the objection, stating:

"Oh, yes. We're not concerned with what another jury would do. That's true. We're just dealing with this case." [20]

Laidlaw's counsel then continued with another line of argument.

Again, plaintiffs belatedly complain that the court should have given the jury a special instruction to disregard the argument of Laidlaw's counsel. However, again,

---

18. N.T. at 129.
19. *Id.*
20. N.T. at 130.

Mr. Mandracchia did not request any instruction at the time of his objection. Nor did he request any special instruction during the court's final charge to the jury. Had such a request been made, the court may have given such an instruction. However, in the absence of a request for a special instruction, the court had no obligation to give one. See *Vernon v. Stash, supra.*

Moreover, although the court sustained plaintiffs' objection, a closer reading of the record indicates that plaintiffs' objection misstated the argument of Laidlaw's counsel. It appears that Mr. Baker was *not* asking the jury to consider the way another jury might look on this particular case. He was arguing that it would be wrong for any jury to say that, simply because a defendant is a big company, an injured party should be given an award even though there was no negligence. What Mr. Baker was attempting to impress upon the jury was the need to judge each case on its merits.

Mr. Baker was responding to a clearly "over-the-line" statement by Mr. Mandracchia in his closing about what a big company Laidlaw is. Mr. Baker was also responding to Mr. Mandracchia's blatant appeal to sympathy in his closing argument, which he delivered in overly theatrical tones, waving around the blown-up photograph of the deceased child. Compared to plaintiffs' closing argument, the argument presented by Laidlaw's counsel was a model of propriety.

### III. *The Jury Charge*

Plaintiffs' complaint about the jury charge is puzzling. The court correctly instructed the jury:

"In determining damages you are not to guess or speculate or engage in conjecture, nor are you to award damages based on sympathy."[21]

This principle is well established, and our refusal to so instruct the jury would have been improper. See *Carroll by Burbank v. Philadelphia Housing Authority,* 168 Pa. Commw. 275, 280, 650 A.2d 1097, 1100 (1994) ("[A] jury may not award damages on the basis of speculation or conjecture.").

Plaintiffs complain that the jury was confused because our instruction on pain and suffering damages immediately followed this point. However, plaintiffs' argument is incorrect in several respects. First, the instruction on pain and suffering did not immediately follow the instruction against guessing or speculating; two other paragraphs intervened.[22] Second, the two instructions are not inconsistent. Obviously, pain and suffering cannot be proven in a specific dollar amount and some degree of estimation is always required. This does not mean that pain and suffering damages may never be awarded. It means that a jury is not to speculate on the extent of the injuries or the extent of the pain and suffering resulting therefrom. But if pain and suffering have been proven, then an amount of money may be awarded even if this requires some degree of estimation.

Finally, this issue was not raised in the charge conference or at any other time during the trial. At the close of the charge, the court asked counsel if there were any

21. N.T. at 156.
22. N.T. at 156-57.

additions or corrections they wished to bring to the court's attention.

At this point, counsel approached and the following sidebar discussion took place:

"Mr. Mandracchia: Just one question. And maybe I heard it wrong, on the pain and suffering what you said was that it still—out of respect for the pain and suffering, that there's no way to measure—I mean it—

"The court: I didn't say that.

"Mr. Mandracchia: Okay.

"The court: I said the damages were not to be based on the speculation, guess or conjecture. It's a pretty standard charge. Do you want me to change that? I can't. Okay?

"Mr. Mandracchia: Okay." [23]

Thus, plaintiffs' counsel never objected to any portion of the charge. He merely asked for clarification of what the court had said. When this was explained, he replied, "Okay."

Now, at this late date, though acknowledging that the substance of the charge was legally correct, plaintiffs' counsel claims that the instruction against speculating was stated too close to the instruction on pain and suffering damages. If plaintiffs' counsel wished to raise this point, they should have objected or asked for a clarifying instruction. This they failed to do. Therefore, this issue has been waived.

Moreover, the jury found that Reppert was not negligent and that Laidlaw, while negligent, was not causally

---

23. N.T. at 163-64.

negligent. As to Rehrig, who was the only defendant found causally negligent, the claim against her was settled before trial on a joint tort-feasor release. Therefore, even if there was an error in the charge on damages, it had no effect on the outcome of this case. It certainly cannot be the basis for a retrial of plaintiffs' claim against Reppert or Laidlaw.

Finally, plaintiffs argue that the jury verdict in this case, awarding zero damages against Rehrig, reflects jury confusion about the charge on damages. However, plaintiffs' post-trial motion did not claim that the verdict was against the weight of the evidence. Hence, we cannot consider such an issue. Moreover, an award of zero damages was not shocking based on the evidence. The jury could have found that April, who died at the scene, was in a dazed or semiconscious condition from the moment of the impact until she expired shortly thereafter, thus negating any claim for pain and suffering. The jury could also have found that as a learning disabled child, April's gross earnings during her work life would not have exceeded her maintenance expenses. Laidlaw's counsel did a very effective job of cross-examining plaintiffs' expert economist on this point.

For all of these reasons, plaintiffs' motion for post-trial relief is denied.

## ORDER

Now, June 28, 2000, upon consideration of plaintiffs' motion for post-trial relief, after review of the parties' briefs and oral argument, and for the reasons set forth in the accompanying opinion, it is ordered that said motion be, and hereby is, denied.