# Morder v. Professional Aerials Inc.

*Orris C. Knepp III,* for plaintiffs.
*C. Kent Price,* for defendant.

CLARK JR., *J.,* May 18, 2006—

## INTRODUCTION

In 1996, the plaintiff, Barry R. Morder, was severely injured in a construction accident in the City of Harrisburg, Dauphin County, Pennsylvania. Mr. Morder was employed at the time by Palmer Construction Company Inc., whose president and sole stockholder is William L. Palmer. Mr. Palmer is also president and sole stockholder of the defendant, Professional Aerials Inc. (Pro Aer). Pro Aer sells and leases man-lifts used at construction work sites.

On April 18, 1996, at approximately 3:15 in the afternoon, the Mr. Morder was asked by a co-worker, Herschel "Rusty" Dutton, to help pin a metal strut to the steel structure of the building under construction. Mr. Dutton and Mr. Morder climbed into the basket of a JLG 60F boom-lift (a type of man-lift), owned by Pro Aer. Mr.

Dutton was the operator of the lift mechanism and the plaintiff was the passenger. Significantly, Mr. Dutton had never been properly trained or certified to operate this particular type of boom-lift.

Due to his near-fatal injuries, Mr. Morder did not know exactly what caused the accident, but from all the trial testimony, the following scenario is what most likely occurred. We must begin by explaining how a boom-lift operates. There are two primary parts of a boom-lift. The bottom part is the motorized chassis. It is similar to an automobile in that it contains the engine and driveline mechanisms to propel the lift forward and backward on four wheels. The top part of the lift is the arm, commonly called a "boom," to which is attached the basket in which the workers stand. The boom can swivel around the chassis and it can also telescope up and down. The articulation of the boom and basket is accomplished by mechanical and hydraulic components of the machine.

Inside the basket is the control panel which operates the machine. On the control panel is the drive lever and engine throttle. The drive lever propels the machine forward or backward when it (lever) is pushed forward or backward. The drive lever has a collar that must be lifted in order to move the lever forward or backward. The collar is a safety feature that ensures that the drive lever cannot be moved accidentally.

From the control panel, an operator can drive the chassis as well as operate the boom. However, since the boom can rotate, the operator must always be cognizant that he may not always be facing in the same direction as the "normal" forward motion of the machine when driving the boom-lift while standing in the basket. Thus, the

basket is rotated such that it is facing the rear of the chassis, then the operator will be facing backward when driving the lift forward. In that situation, the driver must be vigilant to remember that if he puts the drive lever in the "forward" position, the boom-lift will move forward although the driver will have the perspective of moving backward. This reverse-movement scenario is part of what happened in the instant case.

It is also important to note that the boom-lift in the case at bar had a defective foot pedal. A foot pedal is a safety device in the basket at the base of the control panel that prohibits the control panel from being operated unless the pedal is depressed by the machine operator. On the date of the accident, the control panel would operate despite the foot pedal not being depressed. A foot pedal helps ensure that an operator will not accidentally bump into the control panel and drive the lift. It also forces the operator to face the control panel when driving the lift, thereby being able to directly view the labels and other informational nomenclature printed on the control panel.

Mr. Dutton knew that the foot pedal was not operational. James Peck, a Palmer Construction foreman, testified that he rode in the boom-lift with Mr. Dutton two weeks before the accident and Mr. Dutton notified him that the pedal was not working. Randy Bunch, also a Palmer Construction foreman, testified that he rode with Mr. Dutton in the lift on the morning of the accident and Mr. Dutton informed Mr. Bunch that the foot pedal was not operational.

Mr. Dutton and Mr. Morder were together in the basket of the lift at the time of the accident. Mr. Dutton

apparently tried to get the basket as close to the building as possible. He drove the boom-lift forward toward the building but the front wheels were apparently stopped by steel beams that were on the ground beside the building. Mr. Dutton attempted to get closer to the building by rotating the arm that was holding the basket, around to the side facing the building. At this point the control panel was facing the rear of the lift. Mr. Dutton then raised the basket to the fourth floor and Mr. Morder began attaching his strut to the building.

At some point, Mr. Dutton attempted to move the lift away from the building. However, since the foot pedal was broken, Mr. Dutton did not have to face the control panel in order drive the machine. Mr. Morder and Mr. Dutton were facing the building at the time of the accident. Mr. Dutton merely reached back to the throttle while facing away from the control panel.

Since Mr. Dutton was not facing the control panel, he apparently became disoriented. He evidently pushed the throttle away from the building attempting to have the lift move away from the building. However, since the basket was rotated and was facing the rear of the chassis, he in fact moved the boom-lift toward the building.

At first the lift did not move because the front wheels were stopped against the steel beams on the ground. Mr. Dutton kept giving the wheels more and more torque until the wheels sped over the steel beam and the boom-lift crashed into the building pinning the workers against the control panel. Mr. Morder felt the boom-lift suddenly lurch forward (toward the building). Since Mr. Morder had been facing the building, he did not see what exactly caused the man-lift to lurch.

Mr. Morder and Mr. Dutton were eventually extricated from the basket by their co-workers and were taken by ambulance to Hershey Medical Center. Mr. Dutton died from his injuries and Mr. Morder sustained severe damage to his abdomen, especially his lower intestinal tract, including the de-gloving of his bowel.

Mere hours after the accident, Mr. Palmer arrived on the work site and instructed two Pro Aer mechanics to inspect the boom-lift involved in the accident. The mechanics determined that the lift had a faulty foot pedal, in addition to significant other physical damage which was solely caused by the accident.

Mr. Palmer ordered the mechanics to replace the defective foot pedal with a worn (used) foot pedal from another identical man-lift at the work site. He (Palmer) then ordered that a brand-new foot pedal be placed on the other lift (the one from which the worn (used) pedal had been removed). This replacement of foot pedals occurred before Mr. Palmer contacted OSHA to inform them of the accident. The net effect of this pedal-swapping endeavor was to have a functional, but worn-appearing pedal installed on the lift involved in the accident, and a new pedal switch installed on the machine unrelated to the accident.

Mr. Palmer also had the entire boom-lift subsequently refurbished without ever informing the plaintiffs. Only when Mr. Morder inspected the boom-lift during the discovery phase of this lawsuit, and recognized that the lift had been altered, did the defendant inform the plaintiffs of the changes. Further, the faulty foot pedal and other replaced parts were disposed of by the defendant before the plaintiffs' expert could inspect them.

## PROCEDURAL HISTORY

The plaintiffs filed their complaint on December 29, 1997. A companion lawsuit was filed by the Estate of Herschel Dutton against the defendant, but that case eventually settled and is not directly relevant to the case at bar. The plaintiffs' original complaint alleged the following claims: Count I, negligence; Count II, products liability; Count III, negligent infliction of emotional distress; Count IV, loss of consortium on behalf of Mrs. Morder; and Count V, spoliation.

The defendant filed preliminary objections to paragraphs 22-32 of the plaintiffs' count of negligence (Count I). Significantly, no preliminary objection was *ever* filed to paragraph 35 of the plaintiffs' complaint (a rather all encompassing claim of negligence). The defendant also filed a preliminary objection to Count V, spoliation. On October 14, 1998, The Honorable Todd A. Hoover dismissed Count V, spoliation, from the plaintiffs' complaint but found the remaining counts to be sufficiently pled.

We note that Judge Hoover did not dismiss the count for spoliation based on the merits of the case, *i.e.* that spoliation of evidence did not in fact occur or was not sufficiently pled. Rather, Judge Hoover concluded, that as a matter of law, "a cause of action for spoliation by an adverse party is not a viable cause of action in Pennsylvania." Opinion, p. 4, October 14, 1998, citing to *Elias v. Lancaster General Hospital,* 710 A.2d 65 (Pa. Super. 1998). Therefore, although spoliation was dismissed as a separate count in the complaint, this court was not precluded from admitting evidence of spoliation in the trial of the case.

On or about November 4, 1999, Pro Aer filed an additional defendant complaint against JLG Industries, the manufacturer of the boom-lift. On November 24, 1999, JLG filed an answer to Pro Aer's complaint which alleged new matter, including failure to properly train users of the lift, failure to properly inspect the lift, and failure to provide the proper manuals to the users of the boom-lift. None of these additional allegations of negligence were specifically pled in the plaintiffs' original complaint.

Perhaps as a strategic plan, the defendants moved to dismiss its additional defendant claim against JLG after comprehensive discovery had taken place and shortly before the trial of the case. Since the plaintiffs' theory of the case was based in negligence, it was compelled to dismiss its products liability claim (Count II) and concur in the dismissal of JLG from this case. Once JLG was no longer a party, the defendant moved to exclude all claims of negligence raised by JLG which were not specifically listed in the plaintiffs' original complaint.

In the defendant's motion in limine, it correctly pointed out that the statute of limitations had long since expired so the plaintiffs could not amend their complaint to add a new cause of action that may have been raised by JLG. However, the defendant appears to have also presumed by that limine motion that the plaintiff could not, therefore, assert and offer proof in support of the allegations of the various forms of additional negligence which had been averred by JLG, as part of the plaintiffs' presentation of their case to the jury. The defendant was incorrect in that presumption.

However, after full consideration of all issues, the court denied the defendant's motion on the ground that the

plaintiffs' complaint contained a general all-encompassing clause (paragraph 35) in its negligence claim (Count I). Therefore, the plaintiffs were permitted at trial to pursue theories of negligence that were not specifically pled in their original complaint, but could reasonably be includable in that general clause of negligence. (Paragraph 35.) Additionally, and prior to trial, the plaintiffs also dismissed Count III, negligent infliction of emotional distress from the case.

A jury trial was conducted in this matter that lasted one week. The jury found in favor of the plaintiffs and entered verdicts in favor of Barry R. Morder in the amount of $648,263 and in favor of Amy Morder in the amount of $100,000. The plaintiffs filed a motion for delay damages asking for an additional $325,601.20. The defendant, Pro Aer, filed several post-trial motions. The parties have filed extensive briefs in support of those post-trial motions (defendant) and in opposition thereto (plaintiff). In-depth oral argument was also conducted, followed by the submission of post-argument memorandums. These various post-trial motions are now ripe for disposition.

## ISSUES

As defined by the defendant in its post-trial motions, the issues which this court must address are as follows:

(1) This honorable court committed reversible error in denying defendant's motion in limine to limit the scope of plaintiffs' evidence, thereby permitting the plaintiffs to introduce evidence regarding matters other than defendant's failure to repair and maintain the subject boom-lift.

(2) This honorable court committed reversible error in denying defendant's motion in limine to preclude evidence of defendant's post-accident conduct, thereby permitting the plaintiffs to introduce evidence of conduct that occurred after the accident, that had no probative value, and was prejudicial to the defendant.

(3) This honorable court committed reversible error in precluding the defendant from arguing the comparative negligence of plaintiff Barry R. Morder to the jury, in refusing to include special verdict interrogatories on the issue of comparative negligence, and in refusing to instruct the jury on comparative negligence.

(4) The honorable court committed an abuse of discretion in refusing to include separate jury questions on the defendant's negligence based upon the theory of failure to repair and maintain the boom-lift as alleged in the complaint, on the one hand, and failure to inspect the boom-lift, to have proper manuals on board the boom-lift, failure to provide job site safety supervision, and failure to provide a safe work site environment, on the other hand, which latter theories were the subject of defendant's aforesaid motion in limine to limit the scope of the plaintiff's evidence.

(5) The honorable court committed reversible error in failing to grant defendant's motion for nonsuit where the plaintiffs' expert, Barris Evulich, did not offer any opinions regarding causation between the alleged acts of negligence on the part of the defendant and the harm suffered by the plaintiffs.

## DISCUSSION

(1) *This Honorable Court Committed Reversible Error in Denying Defendant's Motion in Limine To Limit the Scope of Plaintiffs' Evidence, Thereby Permitting the Plaintiffs To Introduce Evidence Regarding Matters Other Than Defendant's Failure To Repair and Maintain the Subject Boom Lift*

The defendant is objecting because we allowed the plaintiffs to argue claims that were not specifically enumerated in the plaintiffs' original complaint. the plaintiffs' original complaint, in paragraphs 21-30, lists numerous specific claims against Pro Aer, sounding in negligence, that are all related to Pro Aer's failure to properly maintain and/or repair the boom-lift. The defendant asserts that these should have been the only claims that the plaintiffs could have raised at trial.

The defendant claims that we should not have allowed claims alleging the defendant's failure to properly train Mr. Dutton in the operation of the lift; failure to have manuals on board the lift; failure to provide job site safety supervision; and failure to provide a safe work site environment. The defendant argues that none of these aforesaid claims of negligence are included in the charges of failure to maintain and repair the man-lift. Further, the defendant points out that the statute of limitations had already expired on this case at the time of trial.

We agree with the defendant that a party cannot add a new cause of action after the statute of limitations has expired. However, a plaintiff can amplify a cause of action that has already been listed in the complaint. See

*Connor v. Allegheny General Hospital,* 501 Pa. 306, 461 A.2d 600 (1983).

After careful review of this matter, we found that the additional claims are mere amplifications of the negligence cause of action which were reasonably includable in the wording of paragraph 35 of the plaintiffs' complaint. This paragraph states:

"(35) The accident in the case at bar was caused by the negligence and carelessness of Professional Aerials Inc., t/a PRO AER, its agents, servants, and employees in the scope of their employment." Complaint, filed December 29, 1997, Paragraph 35.

Therefore, based on the language of paragraph 35, the plaintiffs contend that the defendant could be held potentially liable for *any* act of negligence committed by Pro Aer or its employees that caused the accident. It is critical to the determination of this issue to remember that the defendant *never* challenged this broad and virtually all-encompassing language by means of any preliminary objection.

In *Connor v. Allegheny General Hospital,* 501 Pa. 306, 461 A.2d 600 (1983), the Pennsylvania Supreme Court ruled that claims which were not specifically enumerated in a complaint could still be heard if they were mere amplifications of claims that were already in the complaint. In *Connor,* the employees of the defendant hospital, Allegheny General Hospital performed an enema with a barium solution on the plaintiff, Mrs. Connor. Mrs. Connor's bowel (colon) was perforated during that procedure, and barium leaked into her body causing harm. Mrs. Connor's complaint alleged that the employees of

Allegheny negligently perforated her colon which caused the barium to leak. However, her complaint also alleged that the hospital was negligent in "otherwise failing to use due care and caution under the circumstances." *Connor,* 501 Pa. at 310, 461 A.2d at 602.

Prior to trial, Mrs. Connor, was forced to obtain a new expert witness. Her new expert refused to testify that the employees of Allegheny negligently perforated her colon. However, the expert would testify that the doctors at Allegheny failed to diagnose and treat the barium leak in a timely fashion.

Allegheny filed a motion for summary judgment claiming that Mrs. Connor was attempting to add another cause of action after the statute of limitations had expired. The trial court granted the motion for summary judgment and the Superior Court affirmed. However, the Pennsylvania Supreme Court reversed. The Supreme Court stated,

"In this case, appellants' proposed amendment does, in fact, amplify one of the allegations of the original complaint. In their original complaint, appellants did not merely allege that the barium enema had been negligently performed. Rather, appellants also alleged that appellee, acting individually and through its employees, was negligent '[i]n otherwise failing to use due care and caution under the circumstances.' *Appellants' proposed amendment simply specifies the other ways in which appellee was negligent in this case.*" *Connor v. Allegheny General Hospital,* 501 Pa. at 310, 461 A.2d at 602. (emphasis added)

We believe that this case is very similar to *Connor.* Although the specific allegations in the other paragraphs

of the plaintiffs' complaint refer to maintenance and repair of the man-lift, we believe that paragraph 35 is sufficiently broad to include the other negligence allegations against the defendant, such as failure to train Mr. Dutton. Paragraph 35 states that the accident was caused by the negligence and carelessness of Pro Aer. Clearly, failing to train Mr. Dutton was an act of negligence that significantly contributed to, if not outright caused the accident. At the trial, the plaintiff simply specified the other ways in which the defendant was negligent and careless. Simply stated, the plaintiffs left a large "open door" in their complaint, and the defendant, for whatever reason, failed to close it in the early portions of the case, particularly by means of a preliminary objection. At trial, the plaintiffs simply "walked through" that open door.

As we noted earlier, the defendant could have filed a preliminary objection against paragraph 35 for lack of specificity had it chosen to do so. Instead, and quite remarkably, the defendant answered this allegation with a general denial which implies it understood the far-reaching nature of the allegation. See *Connor,* 501 Pa. at 311 n.3, 461 A.2d at 602 n.3.

The defendant objects vigorously to our broad interpretation of paragraph 35 and *Connor.* First, the defendant attempts to argue that paragraph 35 is not similar to the language expanded upon by *Connor,* because it does not use the word "otherwise" or in some other way denote that it is including claims not already mentioned in the complaint.

We are not persuaded by the defendant's semantical argument. We see no reason why the phrase, "The ac-

cident in the case at bar was caused by the negligence and carelessness of Professional Aerials, . . ." should be read to only include the specific allegations otherwise listed in the complaint. This phrase can refer to any type of negligence and carelessness.

The next argument of the defendant is that paragraph 35 had to be included in the complaint, even if the complaint was limited to the express claims, because the defendant is a corporation and therefore can only be found liable through the actions of its employees.

We agree that the complaint needed to have language holding the corporation liable through the actions of its employees. However, there is no reason the defendant could not have filed a preliminary objection to narrow the scope of the actions of the employees for which the corporation could be found liable. Instead, the language which was originally pled and survived in the complaint permitted the corporation to be found liable for any act of negligence and carelessness of the corporation or its employees that caused the accident.

The defendant next argues that paragraph 35 should be read and interpreted in context with the rest of the complaint. The defendant points out that the plaintiffs had, in an earlier motion, stated that the elements of the complaint should be read together in context. We do not agree that each paragraph of a complaint must be read together, regardless of the plaintiffs' earlier statement in support of its position on a prior motion. The ruling in *Connor* clearly maintained that paragraphs in a complaint should be interpreted independently for purposes of making a determination of the types of issues presented herein.

Finally, the defendant argues that the additional claims of the plaintiffs should not be allowed because they are not mere amplifications of earlier arguments but are entirely new causes of actions. We find that this assertion is a gross mischaracterization of the facts of the case and the pertinent pleadings. We will now review cases subsequent to *Connor* to determine if the claims at bar are mere amplifications or entirely new causes of action. We will begin with *Reynolds v. Thomas Jefferson University Hospital and Beneski,* 450 Pa. Super. 327, 676 A.2d 1205 (1996).

In *Reynolds,* Ms. Reynolds suffered massive heart failure and Dr. Beneski placed a breathing tube down her throat to prepare her for an emergency procedure. Subsequent to the procedure, Ms. Reynolds had a sore throat and could not speak above a whisper. Her treating physician, Dr. Chambers, advised her for a number of months that her voice would return but it did not. Eventually, Ms. Reynolds underwent surgery to restore her voice.

Ms. Reynolds sued the hospital and Dr. Beneski for improperly intubating her (placing the tube down her throat). However, after the statute of limitations had run, Ms. Reynolds' expert would not testify that Dr. Beneski was negligent but rather claimed that Dr. Beneski saved Ms. Reynolds' life. Her expert did opine, however, that Dr. Chambers was negligent for not referring Ms. Reynolds to a throat specialist earlier.

The defendant hospital moved for summary judgment on the ground that the claim against Dr. Chambers was a new cause of action which was not listed in the complaint. Ms. Reynolds argued that her complaint contained a catchall that stated, "failure to act properly under the

circumstances," which should include the actions of Dr. Chambers.

The Superior Court denied Ms. Reynolds' claims. The court noted that the catchall was not a separately numbered paragraph but was just a lettered paragraph (letter "n") under paragraph 8 that stated "the intubation . . . was performed in a negligent manner consisting of: . . . (a-n)." *Id.* at 339, 676 A.2d at 1211. Thus, the Superior Court determined that the catchall was not an independent claim but a subordinate clause that specifically referred to the intubation and not the aftercare.

The Superior Court also noted that this was a separate claim because it dealt with two different defendants (Dr. Beneski versus Dr. Chambers), regarding two different actions (intubation versus the aftercare), and it occurred at two different times (Ms. Reynolds' expert claimed Dr. Chambers should only have known there was a problem ten days after the intubation).

Our case is much more similar to *Connor* than to *Reynolds*. Paragraph 35 is its own separately numbered paragraph and is not subordinate to any other clause. Further, the claims are against the same defendant, Pro Aer. Finally, all the claims of negligence involve the same incident.

The defendant also cites to the case of *Rachlin v. Edmison,* 813 A.2d 862 (Pa. Super. 2002). In that case, the plaintiff, Ms. Rachlin, had two eye surgeries to eliminate her need for contact lenses. Her eyesight worsened and she sued the ophthalmologist who performed the surgeries. Her complaint listed the ophthalmologist's office as well as its employees and agents.

Prior to trial and after the statute of limitations had expired, Ms. Rachlin's expert opined that her optometrist had provided defective aftercare. Ms. Rachlin claimed that she could sue her optometrist (who had an independent office) because he was an "agent" for her ophthalmologist.

The Superior Court would not allow her to sue her optometrist. The court ruled that in order to make a claim against an agent, the agent must be identified in the complaint and it (complaint) must explain how the principal ratified the actions of the agent. Therefore, the court ruled that Ms. Rachlin could not sue the optometrist because he was never named in the complaint nor were any of his actions listed in the complaint. The court also concluded that the aftercare provided by the optometrist was a separate cause of action and needed to have been pleaded in her complaint.

*Rachlin* is not similar to the case at bar. Like *Reynolds, Rachlin* involves a plaintiff trying to add a new defendant to the complaint. Further, the incident of the negligence (the aftercare) was not the same incident that allegedly caused the plaintiff's injuries in the complaint (*i.e.* the surgery).

The plaintiffs' complaint adequately put Pro Aer on notice of the claims against it. Pro Aer knew that it was being sued as a defendant and that it was charged with causing the boom-lift to injure Mr. Morder. As far as how it was alleged to have caused the injury, Pro Aer knew it was alleged to have failed to maintain the lift and should have known (via paragraph 35) that there were other allegations of negligence as well. If Pro Aer did

not object to paragraph 35, it cannot now claim that it was not put on notice of the possible claims against it.

(2) *This Honorable Court Committed Reversible Error in Denying Defendant's Motion in Limine To Preclude Evidence of Defendant's Post-Accident Conduct, Thereby Permitting the Plaintiffs To Introduce Evidence of Conduct That Occurred After the Accident, That Had No Probative Value, and Was Prejudicial to the Defendant*

The defendant, Pro Aer, claims that it was prejudiced because we allowed testimony of its post-accident conduct. The defendant lists the following portions of the testimony to which it is opposed:

"The proposed testimony included allegations that Pro Aer attempted to hide the alleged defect of the foot pedal by changing the foot pedal within hours of the accident (N.T. 417-19, 429, 577); William Palmer, Pro Aer's sole stockholder, visited Plaintiff Barry Morder at the Critical Care Unit of the Hershey Medical Center and allegedly attempted to solicit information about the accident from Barry Morder and allegedly told Amy Morder that she had to remove her husband's vehicle from the job site and that Palmer would personally drive her to the job site to remove the vehicle (N.T. 435-39, 441, 460-62); Marty Marcus visited Barry Morder at the Hershey Medical Center while Mr. Morder was on a morphine drip, and allegedly attempted to elicit information about the accident from Mr. Morder (N.T. 342-43, 505); and Pro Aer acted with deceit when it disposed of parts of the man-lift in question before such parts could be inspected by an expert (N.T. 140-46, 148, 417-19,

427-29, 577, 584-85)." Brief of defendant in support of its motion for post-trial relief, August 8, 2005, p. 20.

Therefore, the incidents of post-accident conduct at issue are: (1) the changing of the foot pedal, (2) the attempts to solicit information while Mr. Morder was incapacitated, and (3) the disposal of parts of the boom-lift (*i.e.,* the foot pedal, control panel, and platform) before those parts could be inspected by the plaintiffs. The defendant admits that these incidents occurred, but denies there was any malevolent intent to hide evidence. The defendant's assertions with regard to these matters are disingenuous, at best.

The defendant claims that whatever actions occurred after the accident should not be admitted because they are not relevant. The defendant cites to Rule 402 of the Pennsylvania Rules of Evidence that states, "Evidence that is not relevant is not admissible." Pa.R.E. 402. Rule 401 defines "relevant evidence" as: "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pa.R.E. 401.

Pro Aer argues that whatever happened after the accident is not relevant because it does not demonstrate any fact of consequence to be "more or less probable." This is because all the facts of consequence (*i.e.,* facts that relate to the cause of the accident) already occurred before or at the time of the accident, at least according to the defendant.

We found, however, that the defendant's post-accident conduct was relevant to the determination of whether it

committed spoliation. We also found that the fact that Mr. Palmer surreptitiously attempted to extract information from a seriously injured and incapacitated person (Mr. Morder), switched the defective foot pedal with a working worn pedal, and completely refurbished the boom-lift before the plaintiffs' expert could examine it, showed a possible intent to deceive.

The plaintiffs, from the outset of this case, have contended that the defendant was guilty of spoliation. Indeed, the plaintiffs had an original count of spoliation in their complaint. However, as mentioned above, that matter was the subject of a preliminary objection sustained by the Honorable Todd A. Hoover based upon *Elias v. Lancaster General Hospital,* 710 A.2d 65 (Pa. Super. 1998). Nevertheless, the spoliation issue remained in the case as an evidentiary matter and not as a cause of action.

As a result of extensive pretrial motions, briefs, and oral arguments, this court determined that the plaintiffs made a very strong, pretrial, prima facie showing of spoliation. Therefore, we ruled that the plaintiffs could put on their evidence of such matters during their case in chief and that we would reserve final ruling on whether or not the plaintiffs were entitled to a jury instruction concerning spoliation at the close of the case.

When that moment arrived, we found that the plaintiffs indeed had made the requisite showing and they were entitled to a spoliation instruction.

A party who has relevant evidence within its control and fails to produce said evidence, without a satisfac-

tory reason for doing so, may have an inference drawn against it by a jury that "the destroyed evidence would have been unfavorable to the offending party." *Schmid v. Milwaukee Electric Tool Corporation,* 13 F.3d 76, 78 (1994) adopted by *Schroeder v. PennDOT,* 551 Pa. 243, 710 A.2d 23 (1998). In order to grant a jury instruction for spoliation a court must look to the three *Schmid* factors: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party, and (3) the availability of a lesser sanction that will protect the opposing party's rights and deter similar conduct." *Schroeder v. Commonwealth of Pennsylvania,* 551 Pa. 243, 250-51, 710 A.2d 23 (1998).

We will now analyze the three *Schmid* factors. The first factor is the degree of fault.

Mr. Palmer changed the defective foot pedal on the very night of the accident, before contacting OSHA, and he conveniently installed a used pedal instead of a new one so the switch would not be obvious to OSHA inspectors/investigators or other onlookers. Further, he and his employees attempted to garner information from Mr. Morder while he (Morder) was seriously sedated and totally incapacitated. Finally, Mr. Palmer disposed of the defective portions of the boom-lift (foot pedal) and refurbished the lift before plaintiffs' expert could examine the machine. Since Mr. Palmer owned the boom-lift, there is no reason why he could not have given notice to the plaintiffs that he intended to repair it. Finally, Mr. Palmer did not even inform the plaintiffs that the machine had been repaired until after the plaintiffs noticed the changes. When analyzing the post-accident conduct in

its totality, we believe that the defendant's degree of fault was very large. Again, we will simply state that in our view the defendant's conduct, via the actions of Mr. Palmer, do not even begin to pass any test for a lack of malevolent intent.

With regard to the second *Schmid* factor, the degree of prejudice to the non-offending party, the defendant claims that there was very little prejudice against the plaintiffs because Pro Aer admitted the defects of the boom-lift before trial. This presumes, however, that the plaintiffs' expert would not have found additional defects in the pre-destroyed evidence or the pre-refurbished lift. We believe that the plaintiffs were substantially prejudiced because they were forced to rely on the assertions of the defendant.

Finally, we believe that there was no lesser sanction available than a spoliation instruction to protect the plaintiffs and to deter the defendant from this type of behavior in the future. We note that we even allowed the defendant's counsel to draft the spoliation jury instruction. Further, our instruction did not tell the jury that they *had* to draw a negative inference from the missing evidence, but that they could draw a negative inference if they so chose. (N.T. 629, ll. 6-13.)

The defendant also argues that even if the post-accident conduct was relevant, it should still not have been admitted because of Rule 403 of the Pennsylvania Rules of Evidence. This rule states, "Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice. . . ." Pa.R.E. 403.

The defendant argues that the probative value of the post-accident conduct was minimal. First, the defendant notes that the plaintiffs' main allegation at trial had nothing to do with a defect of the lift but rather alleged that the defendant failed to train Mr. Dutton to properly operate the lift. Further, the defendant asserts that it admitted the defects of the lift (including the defective foot pedal) prior to trial and therefore there was no evidence of defects that needed to be proven.

In contrast to its probative value, however, the defendant claims that the prejudice of the post-accident conduct was substantial. This case involved a serious accident in which one person died and another was nearly fatally injured. The defendant contends that a jury could become inflamed if they believed that the owner of the lift attempted to conceal evidence. We find that Mr. Palmer attempted to do exactly that.

While the defendant's argument might be mildly persuasive at first glance, on further reflection we must strongly disagree. Aside from the plaintiffs proving their case of spoliation during their case in chief, it also became apparent to us during pretrial discussions with counsels and after examination (as-on-cross) of Mr. Palmer during the plaintiffs' case, that Mr. Palmer would also voluntarily testify on the defendant's behalf. At the conclusion of the as-on-cross examination of Mr. Palmer, the defendant's counsel declined an opportunity to examine Mr. Palmer stating, "I will defer until our case." (N.T. 125, l. 25.) Clearly, this confirmed to the court that Mr. Palmer intended to testify. As a result, when Mr. Palmer chose to testify, he put his credibility at issue before the jury. Therefore, an additional basis to allow

the evidence of post-accident conduct arose, namely, to impeach Mr. Palmer's credibility due to his alleged conduct in this case.

We point the defendant to Rule 607 of the Rules of Evidence. This rule states, "The credibility of a witness may be impeached by any evidence relevant to that issue, . . . ." Pa.R.E. 607(b).

We believe that Mr. Palmer's attempt to conceal evidence, discover information improperly, and destroy evidence is extremely probative of his credibility. Therefore, we ruled that the post-accident conduct was relevant and was of such high probative value that it outweighed any danger of unfair prejudice, or the dangers listed in Pa.R.E. 403 namely: confusion of the issues, misleading the jury, considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

We further note that Mr. Palmer in his direct testimony specifically addressed the issue of whether or not he was hiding evidence. He claimed that the work order for the repair of the foot pedal was in his files since the day of the accident. (N.T. 577, ll. 4-25.) Mr. Palmer also stated that OSHA was informed of the switched foot pedal on the day OSHA came to investigate. (N.T. 580, ll. 14-20.) Therefore, the issue of the motive for the possible concealment of evidence was not just raised during the plaintiffs' case, but was raised by Mr. Palmer himself.

The defendant next argues that the post-accident conduct should not have been admitted at trial because it was evidence of subsequent remedial measures. The Pennsylvania Rules of Evidence state,

*"When, after an injury or harm allegedly caused by an event, measures are taken which, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove that the party who took the measures was negligent or engaged in culpable conduct. . . ."* Pa.R.E. 407.

The defendant claims that the switching of the foot pedal, the fixing and eventual sale of the lift, and the interviewing of the plaintiff (Mr. Morder) in the hospital, were all attempts to preclude another accident from occurring. Therefore, the defendant claims that all of this evidence was prohibited from being admitted at trial as remedial measures.

We first note that had the defendant truly been concerned with ensuring that no one would become injured in another accident, it (defendant) would have quarantined the boom-lift until it could be fully inspected by all parties and by OSHA. Therefore, we did not find that the defendant's actions constituted subsequent remedial measures.

However, even if we were to find that the defendant's actions constituted subsequent remedial measures, the post-accident conduct would still be admissible. This is because Rule 407 specifically states, "This rule does not require the exclusion of evidence of subsequent measures when offered for impeachment, . . . ." Pa.R.E. 407. Since we additionally admitted the post-accident conduct for impeachment purposes, this evidence is not proscribed by Rule 407. For all of the reasons listed above, we believe the evidence of post-accident conduct was properly admitted at trial.

(3) *This Honorable Court Committed Reversible Error in Precluding the Defendant From Arguing the Comparative Negligence of Plaintiff Barry R. Morder to the Jury, in Refusing To Include Special Verdict Interrogatories on the Issue of Comparative Negligence, and in Refusing To Instruct the Jury on Comparative Negligence*

We begin by noting that the defendant did not address this issue in his brief; and we could therefore conclude that it had waived that issue. We specifically note that both parties were directed, via our briefing order, to file "a comprehensive brief in support of *all* matters raised in [their] post-trial motion." (emphasis added) Therefore, we will only address this issue for the purpose of ensuring the completeness of this writing.

The Pennsylvania Comparative Negligence statute states, "any damages sustained by the plaintiff shall be diminished in proportion to the amount of negligence attributed to the plaintiff." 42 Pa.C.S. §7102(a). We did not permit the jury to determine an amount of negligence attributable to the plaintiff (Mr. Morder) because we ruled, as a matter of law, that the plaintiff committed no negligence in the case at bar.

Mr. Morder was a mere passenger in the boom-lift. There was no evidence that Mr. Morder was in control of the lift or in any way affected how Mr. Dutton drove or otherwise operated the lift. We also note that there are no responsibilities for a passenger on a lift under the ANSI standards. (N.T. 173.) The possible proper person for the defendant to allege a defense of comparative negligence against would have been Mr. Dutton, had that case involving his (Dutton's) estate proceeded to trial.

It also cannot be argued that Mr. Morder was comparatively negligent by entering the lift in the first place. First of all, there is no evidence that Mr. Morder had any reason to know that Mr. Dutton would drive the lift into the building. Second, there was no evidence that Mr. Morder was a trained lift operator or that he should otherwise have known that the lift was being used improperly as a crane. Therefore, since the plaintiff in no way caused the lift to crash into the building, nor did he knowingly put himself in harm's way, he could not be found to have committed any act which would subject his claims to an instruction concerning comparative negligence.

(4) *The Honorable Court Committed an Abuse of Discretion in Refusing To Include Separate Jury Questions on the Defendant's Negligence Based Upon The Theory of Failure To Repair and Maintain the Boom-Lift As Alleged in the Complaint, on the One Hand, and Failure To Inspect the Boom-Lift, To Have Proper Manuals on Board the Boom-Lift, Failure To Provide Job Site Safety Supervision, and Failure To Provide a Safe Work Site Environment, on the Other Hand, Which Latter Theories Were the Subject of Defendant's Aforesaid Motion in Limine To Limit the Scope of the Plaintiffs' Evidence*

We again note that this issue was not briefed by the defendant and would be subject to being construed a waiver. Therefore, we shall again only discuss it for the purpose of completeness. The defendant wanted to have a separate jury question for the claims that were specifically listed in the complaint (without the inclusion of the paragraph 35 claims) and a separate jury question for the

claims that we allowed to be argued based upon our reading of the rather all-encompassing language contained in paragraph 35 of the complaint. (See our discussion above in issue no. 1.) We however, denied separate jury questions and had one question for all the allegations of negligence.

We saw no reason to have separate jury questions for the different theories of negligence because the liability would be the same no matter what theory of negligence the jury believed caused Mr. Morder's injuries. We did not see the relevance of having the jury decide exactly which theories they agreed or disagreed with. For liability purposes, each theory of liability would hold the defendant equally liable. Further, there would be no difference if the jury found the defendant liable for more than one theory of liability. Therefore, to keep the verdict slip as easy for the jurors to understand as possible, in this rather complicated case, we did not distinguish between the different allegations of negligence.

(5) *The Honorable Court Committed Reversible Error in Failing To Grant Defendant's Motion for Nonsuit Where The Plaintiffs' Expert, Barris Evulich, Did Not Offer Any Opinions Regarding Causation Between the Alleged Acts of Negligence on the Part of the Defendant and the Harm Suffered by the Plaintiffs*

The defendant alleges that the plaintiffs did not meet their burden of proof because their (plaintiffs') expert, Barris Evulich, did not opine as to the exact cause of the accident. In particular, the defendant points to Mr. Evulich's statement, "The specifics of how this accident actually happened will never—no one will ever know."

(N.T. 174.) The defendant is alleging that since the plaintiffs could not prove the exact cause of the accident, they cannot prove that the defendant's negligence led to Mr. Morder's injuries absent conjecture or mere guessing.

The defendant appears to be also attempting to analogize the case at bar to a case of medical malpractice. In a medical malpractice case, an expert must give an opinion in order for a jury to decide the cause of the injury. This is because the issues in medical cases are usually presumed to be beyond the understanding of the average layperson. See *Miller v. Sacred Heart Hospital,* 753 A.2d 829, 833 (Pa. Super. 2000).

However, even medical malpractice cases do not need experts if the proof of negligence is obvious to the lay person. *Miller,* 753 A.2d at 833-34. The defendant is alleging that because of the complicated nature of this case, if the plaintiffs' expert did not state a proper basis to prove negligence, then the jury could not decide on its own that the defendant was negligent.

It is true that a jury cannot speculate or guess as to the cause of an accident. However, a jury is permitted to make reasonable inferences based upon the facts presented in the case. The Pennsylvania Supreme Court has explained:

"We have said many times that the jury may not be permitted to reach its verdict merely on the basis of speculation or conjecture, but that there must be evidence upon which logically its conclusion may be based. . . . Clearly this does not mean that the jury may not draw inferences based upon all the evidence and the jurors'

own knowledge and experiences, for that is, of course, the very heart of the jury's function. It means only that the evidence presented must be such that by reasoning from it, without resort to prejudice or guess, a jury can reach the conclusion sought by the plaintiff, and not that that conclusion must be the *only* one which logically can be sought." *Smith v. Bell Telephone Co.,* 397 Pa. 134, 138, 153 A.2d 477, 479-80 (1959). (citations omitted) (emphasis in original)

We agree that Mr. Evulich did not claim to know exactly what happened on the day of the accident. However, we believe that Mr. Evulich presented more than enough evidence at trial to meet the plaintiffs' burden. We further find that this case is not so factually complicated that the jury could not find the defendant liable without the evidence of an expert. We will now evaluate the evidence that was admitted at trial to determine if the jury could reach its verdict without resorting to unfounded speculation, conjecture or guess.

In this case, the defendant owned and leased a boom-lift upon which Mr. Morder was a passenger and was seriously injured. The safety standards for owners of lifts, who are also dealers of that very same type of construction equipment, require them (owners/dealers) to train the person who uses the lift and to make sure the lift is in safe operating condition. (See American National Standards Institute (ANSI) standards, 9.2.1, 5.2, 5.3, 5.6, 5.6.1, 5.9, 6.4, 6.5, and 6.6.) The jury must determine what caused the accident and if the owner's failure to either properly train the driver or to properly maintain the lift led to the accident occurring.

It was admitted at trial that Mr. Dutton was never properly trained to drive or otherwise operate the boom-lift. (See testimony of William L. Palmer, N.T. 122.) The plaintiffs' expert testified that the defendant was responsible to train Mr. Dutton. (N.T. 159, 160.) Mr. Evulich testified that Mr. Dutton was improperly using a man-lift as a crane. (N.T. 161-62.) Mr. Evulich stated, "a trained operator would not have used that machine." (N.T. 173.) Therefore, a jury could reasonably infer, based upon the testimony of Mr. Evulich, that had Pro Aer properly trained Mr. Dutton, this accident would never have occurred because Mr. Dutton would not have used the boom-lift for this type of assignment.

Mr. Evulich also testified that under the ANSI safety standards, man-lifts are supposed to have a "frequent inspection" every 150 hours or 90 days, whichever comes first, as well as an "annual inspection" no later than 13 months from the last annual inspection. (N.T. 168.) However, the lift was overdue for its frequent inspection (N.T. 70-72) and overdue for its annual inspection by over a month. (N.T. 105.) Further, Mr. Evulich explained that the lift was not properly inspected because the defective foot pedal and illegible safety placards were not compliant with ANSI standards. (N.T. 167.) The lift also did not have the required manuals on board as required by ANSI. (N.T. 161.) Further, James Peck testified that the lift had a defective foot pedal for at least two weeks (N.T. 214-15) and Randy Bunch knew it was defective that morning. (N.T. 227-28.) Therefore, a jury could reasonably infer that had Pro Aer properly inspected its lift, said lift would have been found to be noncompliant with ANSI safety

standards, would have been taken out of service, and would not have been available for Mr. Dutton to use in the accident.

Finally, the testimony of Mr. Evulich was sufficient for a jury to reasonably infer that had Mr. Dutton been properly trained, he (Dutton) would not have crashed the lift into the building. Barring supernatural causes, there are only a limited number of reasons why a lift will crash into a building. The plaintiffs' expert testified that the only item broken on the lift was the foot pedal. (N.T. 175-76.) There was no evidence of an engine malfunction that would cause the lift to drive itself into the building. Further, there was a safety collar on the neck of the drive lever. (N.T. 185-86.) Therefore, even with a malfunctioning pedal, the lift could not have moved without the driver intentionally lifting the collar and moving the lever. (N.T. 189.)

The drive lever was found in the "drive forward" position. (N.T. 188.) Therefore, Mr. Dutton must have lifted the collar and pushed the lever into that position. We therefore can conclude that Mr. Dutton intended to drive the lift. However, it is equally reasonable to conclude that Mr. Dutton would not have intended to drive the lift into the building.

No evidence was presented that Mr. Dutton intended to kill himself or that he purposefully ran the lift into the building. Therefore, a jury could properly infer that Mr. Dutton drove the lift into the building by accident.

Further, a jury does not need an expert to tell them that man-lifts are not supposed to be driven into the

side of buildings. We analogize this case to that of a medical malpractice case in which the doctor left a sponge inside a patient. A jury does not need an expert to know that negligence occurred. See Restatement (Second) of Torts, §328(D), Comment (d), 1965. The doctor's thought process when he left the sponge is irrelevant, and as such, a jury needs no explanation as to why the doctor forgot the sponge. The causes of this tragic construction accident were readily discernable by the jury based on all of the evidence adduced in the trial. Indeed, this is a classic example of the ancient doctrine of res ipsa loquitur.

Mr. Evulich testified that Mr. Dutton, an untrained driver, intentionally moved the drive lever to the forward position and this caused the lift to drive into the building. A jury can reasonably infer that Mr. Dutton was disoriented and did not realize what result would occur from his action. This is especially plausible because the foot pedal was broken. Had the foot pedal been operational, Mr. Dutton would have been forced to realign himself to the control panel. Further, once Mr. Dutton realigned himself (and had the safety placards been legible,) Mr. Dutton may have read the safety placard on the control panel that stated, "When turntable [is] rotated 180 degrees, basket over front wheels, drive and steer functions are reversed." (N.T. 66.) This operational flaw by Mr. Dutton was fatal to him (Dutton) and nearly fatal to Mr. Morder.

It is true that the jury did not know what thought processes were going through Mr. Dutton's mind when he acted. We find, however, that these actions clearly indi-

cate the true cause of the accident and subsequent injuries to Mr. Morder.

We recognize that it might have been possible that Mr. Dutton pushed the drive lever forward for some other, non-negligent reason. Perhaps we could speculate that he meant to push the drive lever in the reverse position but at the exact moment he lifted the collar of the drive lever, he somehow slipped and pushed it in the forward position. While this scenario would be theoretically possible, we find it extremely implausible, indeed fantastic. Without some scintilla of evidence to support this theory (or any other non-negligent theory), we find that a jury can, and did, properly infer from the evidence that Mr. Dutton simply was not properly trained and he became disoriented.

For these reasons, we find that the plaintiffs met their burden of proof and the jury based its verdict upon reasonable inferences from the facts and not upon mere speculation, conjecture, or guess. We have, therefore, issued an appropriate order of even date herewith, denying the defendant's post-trial motions.

## ORDER

And now, to wit, May 18, 2006, pursuant to our opinion of even date herewith, it is hereby ordered that the defendant's post trial motions are denied.